# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

RECEIVED
BY MAIL
JUL 27 2005
CLERK US DIST COURT
ST. PAUL, MN

---

No. 03-2308

---

United States of America, *
*
Plaintiff – Appellee, *
*
v. *
*
Martha Alvarado-Rivera, *
also known as Rosa Ontiveros Aranda, *
*
Defendant – Appellant. *

---

No. 03-2374

---

Appeals from the United States District Court for the District of Minnesota.

CR 02-283(1)(2) DWF/SRN

United States of America, *
*
Plaintiff – Appellee, *
*
v. *
*
Gilberto Moya-Vega, *
also known as Jorge Salinas, *
*
Defendant – Appellant. *

---

Submitted: March 9, 2005
Filed: June 20, 2005

---

Before LOKEN, Chief Judge, HEANEY, BRIGHT, WOLLMAN, MORRIS SHEPPARD ARNOLD, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, and BENTON, Circuit Judges.

---

MURPHY, Circuit Judge.

Martha Alvarado-Rivera and Gilberto Moya-Vega each pled guilty to conspiracy to distribute and possess with intent to distribute over 500 grams of a substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. After considering and rejecting their requests for a sentence below the statutory mandatory minimum through the use of the safety valve provision in 18 U.S.C. § 3553(f), the district court[1] sentenced Alvarado-Rivera to 120 months and Moya-Vega to 135 months. They appealed and a hearing panel reversed, with one judge dissenting. United States v. Alvarado-Rivera, 386 F.3d 861 (8th Cir. 2004). The government's petition for rehearing en banc was granted and the panel opinion vacated. We now affirm the judgments of the district court.

I.

A controlled buy arranged by the Ramsey County Sheriff's office on August 13, 2002 led to the arrest of Alvarado-Rivera and Moya-Vega. An informant had advised deputies that a man he knew as Beto, from whom he had made prior purchases of cocaine, would be driven to the scene of the buy by his wife. According to the informant they would arrive in a champagne colored vehicle, and Beto would have three ounces of cocaine hidden in his crotch. After appellants arrived at the meeting place as predicted, deputies arrested Moya-Vega and found the cocaine hidden in his pants.

---

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

Appellants are Mexican nationals with limited English skills, and Steven Nusbaum, a Spanish speaking agent from the Drug Enforcement Administration Task Force, was called to the scene to question them. Moya-Vega told Nusbaum that the couple lived in a trailer in Blaine and that he did not know the address but his wife would. During her questioning, Alvarado-Rivera also said that the couple lived in a trailer in Blaine and provided the address. Because their car was being impounded, the officers offered to drive Alvarado-Rivera to the trailer. She agreed and consented to a search of the trailer, with the understanding that the officers would leave her there if they found nothing illegal. Agent Nusbaum and two other officers took her to the trailer while Deputy Peter Eastman went to the jail to retrieve her car keys from the officer who transported Moya-Vega.

After Deputy Eastman arrived at the trailer with Alvarado-Rivera's keys, she opened the door with a key on her key ring. There was almost nothing inside the trailer; there were no beds, mattresses, towels, or toilet paper. The refrigerator was almost empty even though Alvarado-Rivera had told Agent Nusbaum during the ride to Blaine that she had gone grocery shopping earlier in the day. Nusbaum challenged her story that she and her husband lived in the trailer, but she insisted they did.

A preliminary search by the officers found no drugs in the trailer, but thereafter a certified narcotics canine alerted to a kitchen cabinet between the refrigerator and sink. Deputy Eastman then led the dog through the whole trailer, and she alerted again to the same location. The officers opened a drawer in the cabinet, saw it was empty, and removed it. Hidden behind the drawer they found twenty seven pounds of methamphetamine, later described as having a distinctive doughy consistency and disc shape. Alvarado-Rivera was placed under arrest and given her Miranda rights. She claimed she knew nothing about the drugs, but continued to insist that she lived in the trailer.

The next day investigating officers found a rent receipt in the material taken from Alvardo-Rivera. The receipt was for an apartment in West St. Paul, and the manager there confirmed that the apartment was occupied by Alvarado-Rivera and Moya-Vega, whom he knew as Rosa Ontiveros Aranda and Jorge Salinas. Officers executed a search warrant for the apartment and found mail and documents linked to both the real names of appellants and to those known to the manager. They also discovered approximately one pound of methamphetamine in the dishwasher; these drugs had the same distinctive consistency and shape as those found in the trailer. In addition they seized approximately $3,875 in cash, small amounts of cocaine and marijuana, a digital scale, two receipts for wire transfers to Mexico of $1,000 and $5,000, and suspected drug notes. The notes appeared to record wire transfers to Mexico over a two month period in the summer of 2002 totaling $99,000.

Gilberto Moya-Alvarado, one of appellants' sons, lived in the next door apartment, and he consented to the search of it and an associated storage locker. Found in the locker were 281.5 grams of methamphetamine, 43.5 grams of cocaine, and 85.2 grams of marijuana. Gilberto said he had moved these drugs from his parents' apartment at the direction of his brother Gustavo after they failed to return home.

II.

Appellants were indicted for conspiracy to distribute and possess with intent to distribute 500 grams or more of a substance containing methamphetamine, two counts of possession with intent to distribute cocaine, and three counts of possession with intent to distribute methamphetamine. They pled guilty to the conspiracy count under 21 U.S.C. §§ 841(b)(1)(A) and 846, each admitting in their plea agreements that they were accountable for approximately 12.94 kilograms of methamphetamine. As for cocaine, Alvarado-Rivera agreed that she was accountable for some 126.7 grams and Moya-Vega took responsibility for approximately 43.5 grams.

Appellants faced a mandatory minimum sentence of 120 months because of the amount of drugs involved in their offense. See 21 U.S.C. § 841(b)(1)(A). Since the government did not move for a substantial assistance departure, their only hope for a sentence below the mandatory minimum was to qualify for the safety valve provided in 18 U.S.C. § 3553(f). Under that provision "less knowledgeable and less culpable offenders" may be able to avoid application of the "often harsh statutory minimum sentences" if they give full and truthful information about their offenses before sentencing. See United States v. Madrigal, 327 F.3d 738, 743 (8th Cir. 2003).

There are five statutory requirements for safety valve eligibility, and it is undisputed that Alvarado-Rivera and Moya-Vega met the first four: (1) they did not have more than one criminal history point; (2) they did not use violence or possess a firearm in connection with the offense; (3) the offense did not result in death or serious bodily injury; and (4) neither was found to be an organizer, leader, manager, or supervisor of others or to have engaged in a continuing criminal enterprise. 18 U.S.C. § 3553(f)(1)-(4). At issue is whether they satisfied the fifth requirement which requires that

> not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan.

18 U.S.C. § 3553(f)(5).

In an attempt to satisfy the fifth safety valve requirement, Alvarado-Rivera and Moya-Vega each participated in proffer interviews with the government. Alvarado-Rivera told the government that she and her husband had sublet the trailer to another person in July 2002 and she had kept a key in order to fix something there. She denied knowing there were drugs in the trailer. She said that she had lied about living in the trailer because she knew there were drugs in the West St. Paul apartment, but

she claimed she had not known about the methamphetamine in the apartment dishwasher because she never used it. She admitted that the drugs found in the storage locker had been in the closet of her apartment, but she said that she had never sold drugs and that her husband's only drug customer was the informant. She claimed that the only money she knew about was gained from selling food she prepared and that she had only used the digital scale to weigh a bracelet. The government told Alvarado-Rivera that based on this proffer it would not recommend application of the safety valve. It offered to interview her again, but she declined.

During Alvarado-Rivera's one hour sentencing hearing, the district judge indicated that he would prefer to sentence her below the statutory minimum but that he could not because there was "no ring of truth" to her safety valve proffer. He found that "whether it's to protect other people or out of fear for her life or her family's, [Alvarado-Rivera is] minimizing her role" and told her, "I don't believe that you've substantially told the truth." He found her statements not credible, including her comments that she had only used the digital scale to weigh a bracelet, that the only money she knew about came from her food sales, and that she knew of only one drug customer. The court expressed its concern for the integrity of the justice system and said, "I don't believe that it's even a close call on how I evaluate the record." In summing up his findings, the district judge told Alvarado-Rivera, "I have found that you're not eligible for the safety valve because I found that the proffer was not substantially truthful based upon all the record that I have in front of me and the circumstantial inferences." He sentenced her to the statutory minimum of 120 months.[2]

---

[2]Unlike Moya-Vega, Alvardo-Rivera had a sentencing guideline range below the statutory mandatory minimum. Her stipulated base offense level of 36, based on the drug quantity she admitted, was capped at 30 and reduced 2 levels for mitigating role and 3 levels for acceptance of responsibility. The resulting guideline range was 57-71 months, but it would have gone to 46-57 months if she had qualified for a 2 level reduction under the safety valve.

Moya-Vega had two proffer interviews. He maintained that his only drug customer was the informant and that all the cash seized from the apartment came from sales to him. Moya-Vega said that his wife had driven him to the last three transactions but that he had traveled by bus the other times. Initially he said that he had sold cocaine to the informant approximately fifteen times, that he usually sold him half an ounce at a time, and that he had gained $50 to $100 per ounce. When the government pointed out that those transactions could not explain the money found in the apartment, he revised his story and said that he had sold cocaine to the informant two or three times per week for sixth months. He admitted that he used the digital scale to measure cocaine.

Moya-Vega admitted that the methamphetamine found in the dishwasher and storage locker was his, but he denied any knowledge of the methamphetamine found in the trailer. He had no explanation for why the methamphetamine from the apartment had the same distinctive appearance as that found in the trailer, and he claimed that he had never sold methamphetamine. He said that his cocaine supplier had provided him with the methamphetamine found in the apartment but that he had not yet attempted to sell it. In his first interview Moya-Vega said that he only knew his supplier of cocaine and methamphetamine as "Coyote." He did not know where Coyote lived, but would just meet him in the street or at McDonald's. In his second interview Moya-Vega said that his supplier was not called Coyote, but rather Carlos or Andres.

Moya-Vega said that the suspected drug notes had been made by Alvarado-Rivera but that they did not relate to drugs. He said that the recipients of the wire transfers were her cousins and that the amounts recorded in the notes were in pesos, not dollars, even though receipts for other transfers showed money sent from the United States in dollars and converted to pesos in Mexico. The government pointed out that even if Moya-Vega were telling the truth about the nature of the currencies, 99,000 pesos would be roughly equivalent to $11,000, a significant amount of money

to transmit in two months. Moya-Vega responded that he had been saving the money for more than a year from his drug dealing and from employment as a construction worker.

After considering the evidence and Moya-Vega's admissions, the district judge said, "None of this makes any sense to me." The judge found that Moya-Vega had not been forthcoming about his involvement and stated, "I'd say one out of a thousand is generous that I'm wrong." He mentioned that lower level participants in drug rings were exploited and said, "I believe that whether it's out of fear for yourself or your family or to protect other people, the information isn't coming forward." The court declined to apply the safety valve, and sentenced Moya-Vega above the mandatory minimum to 135 months, the low end of his stipulated guideline range of 135-168 months (resulting from the stipulated base offense level of 36 with a 3 level reduction for acceptance of responsibility).[3]

Alvarado-Rivera and Moya-Vega appealed, arguing that the government produced no direct evidence to contradict what they had said in their proffers and that their statements were sufficient to entitle them to safety valve treatment. A hearing

---

[3]On January 3, 2005 Moya-Vega moved for supplemental briefing under Blakely v. Washington, 124 S. Ct. 2531 (2004), alleging that his guideline sentence above the mandatory minimum was in violation of the Sixth Amendment because it was based on drug quantity not found by a jury. Since Moya-Vega admitted responsibility for the amount of drugs for which he was held accountable, his Sixth Amendment rights were not violated. See United States v. Booker, 125 S. Ct. 738, 756 (2005). Although the district court committed Booker error by treating the sentencing guidelines as mandatory, Moya-Vega forfeited that claim by not raising it below. See United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005) (en banc). Nothing in the record "suggests a reasonable probability that the district court would have imposed a more lenient sentence absent Booker error," and no "prejudicial plain error" appears. Id. at 553. Nor was his sentence unreasonable. Cf. United States v. Killgo, 397 F.3d 628, 630 n.4 (8th Cir. 2005). The motion for supplemental briefing is denied.

panel reversed, the panel majority holding that the improbability of a safety valve proffer is not a sufficient basis to deny the benefit without proof of falsity, Alvarado-Rivera, 386 F.3d at 870. A dissenting judge objected that the court had conducted a de novo review rather than reviewing the findings of the district court for clear error and that the burden of proof had been improperly shifted to the government. Id. at 872. The United States petitioned for rehearing en banc, the petition was granted, and the panel opinion vacated.

III.

The statute creating the safety valve provides that it is the district court which is to determine at sentencing whether the requirements for the benefit have been met, including whether a defendant has furnished truthful information. 18 U.S.C. § 3553(f). The district court's safety valve findings can be overturned only if they are clearly erroneous. United States v. Romo, 81 F.3d 84, 86 (8th Cir. 1996). Affirmance is required if the record supports the court's findings, regardless of which party is favored. See United States v. Tournier, 171 F.3d 645, 647 (8th Cir. 1999). The test is not whether we "agree with the district court's findings of disputed fact," but whether the record supports them. Id. at 648. The standard is no less deferential when the finding concerns credibility. See United States v. O'Dell, 204 F.3d 829, 838 (8th Cir. 2000); United States v. Surratt, 172 F.3d 559, 566 (8th Cir. 1999).

Defendants have the burden to show affirmatively that they have satisfied each requirement for the safety valve, including whether truthful information and evidence have been given to the government. See United States v. Santana, 150 F.3d 860, 864 (8th Cir. 1998). The safety valve provision was designed to benefit "a narrow class of defendants," H.R. Rep. No. 103-460 (1994), who show they meet the statutory requirements.

Although our cases have consistently held the burden of proof to be on the defendant, see e.g., United States v. Alarcon-Garcia, 327 F.3d 719, 721 (8th Cir. 2003); Wright v. United States, 113 F.3d 133, 134 (8th Cir. 1997), appellants contend that the government has the burden to come forward with additional evidence if it finds a defendant's proffer inadequate. The only authority they cite for this proposition is United States v. Kang, 143 F.3d 379 (8th Cir. 1998). Kang was a case in which the defendant had pled guilty to possessing cocaine base with the intent to distribute and to distribution. At sentencing the district court attributed more than 50 grams of crack to him, holding that he had agreed to that amount in his plea agreement. Id. at 381. The two counts to which he pled only involved a total of 6.84 grams, however, and we found no stipulation to the larger amount. Id. at 381-82. We therefore reversed and remanded for an evidentiary hearing on quantity, an issue on which the government would bear the burden of proof. Id. at 382-83. Because of the conflict in the record on drug quantity, the district court had found the defendant not eligible for the safety valve and the defendant's veracity was left open for further development on remand, but we did not shift the safety valve burden to the government. Id. at 383. Kang is inapposite here where Alvarado-Rivera and Moya-Vega stipulated to the drug quantity for which they were held responsible and the district court made detailed and sound findings about the truthfulness of their proffers.

The findings of the district court that appellants did not satisfy their burden are supported by the record. Alvarado-Rivera and Moya-Vega both made limited admissions in the face of evidence implicating them in major drug activity. Very large amounts of drugs were found in the trailer to which they had unrestricted access (27 pounds of methamphetamine), in their apartment (1 pound of methamphetamine of the same unusual doughy consistency and disc shape as that in the trailer, plus cocaine and marijuana), and in the storage locker to which their son moved drugs from the apartment (281.5 grams of methamphetamine, 43.5 grams of cocaine, and 82.5 grams of marijuana). In addition, there was $3,875 cash in their apartment, they

had receipts for $6,000 wired to Mexico, and there is evidence indicating that they had recently wired another $99,000 over a short period of time (Moya-Vega himself conceded that the equivalent of $11,000 was wired in that period).

Despite this evidence, both claimed that Moya-Vega had only one drug customer, who happened to be the informant, and that he sold only cocaine. Moya-Vega's explanation for the large amount of methamphetamine in the apartment was that his supplier, whom he really did not know, had offered him an opportunity to sell it. That so much methamphetamine would be fronted to a new dealer is not credible. Appellants both denied any knowledge of the 27 pounds of similarly distinctive methamphetamine hidden in the trailer to which Alvarado-Rivera carried a key. She also denied knowledge of the methamphetamine hidden in the dishwasher in her apartment, even though she claimed to make a significant amount of money selling homemade food, and said she had only used the digital scale to weigh a bracelet. No plausible source was identified by appellants to explain the money that was wired to Mexico and recorded in the notes found in the apartment.

Details in the statements given by appellants changed as the investigation progressed and during the course of their proffers. Alvarado-Rivera insisted that she and Moya-Vega lived in an uninhabited trailer until the officers obtained evidence of their other residence. In his proffer Moya-Vega adjusted his history of sales to the informant to try to fit the amount of money he claimed had resulted from those transactions. He also gave varying names for his supplier and disclaimed knowledge of any contact information for him. Appellants did not provide the district court any basis to believe that their latest stories were more reliable than their discredited or withdrawn claims. Both were given opportunities for additional proffer interviews; Alvarado-Rivera declined and Moya-Vega took little advantage of his second although he spoke at his sentencing hearing.

In making its assessment of the truthfulness of a safety valve proffer, the district court is entitled to draw reasonable inferences from the evidence. See United States v. Weekly, 118 F.3d 576, 581 (8th Cir. 1997). Here, the government produced much evidence which the court could consider. This included admissions by appellants in their plea agreements, statements they made to law enforcement agents after the arranged buy was intercepted, and a variety of evidence from the searches of the trailer, the apartment, and the storage locker. The searches turned up a large amount of methamphetamine as well as cocaine and marijuana, thousands of dollars in cash, a digital scale, and wire transfers of significant amounts of money to Mexico. The district court needed no new evidence in order to evaluate the truthfulness of the proffers. The legal test is simply whether the record supports its safety valve findings, see e.g., Tournier, 171 F.3d at 648, and it certainly does here.

The district court did not clearly err when it found that appellants had not truthfully supplied all information about their offenses and therefore had not satisfied their burden to show they had fulfilled all the statutory conditions for obtaining safety valve relief. After thoroughly reviewing the record, we conclude that the evidence supports the findings of the district court. The judgments are therefore affirmed.

BRIGHT, Circuit Judge, with whom HEANEY, Circuit Judge, joins, dissenting.

Martha Alvarado-Rivera was sentenced to ten years in prison, rather than about four years, because the sentencing judge, looking at a written summary of Alvarado-Rivera's unrecorded, untranscribed statement, which the judge did not see or hear, found the statement improbable. The majority affirms, saying the judge's hunch in looking at this impoverished record counts as "substantial evidence."

The majority position effectively turns the safety valve into a discretionary award. It does so by allowing greatly flawed credibility judgments that violate due process requirements. I dissent.

I rely on the panel majority opinion now vacated.[4] I augment that opinion here.

*The Safety Valve and Credibility Judgments*

The safety valve is not discretionary. It is conditioned upon certain facts, but if those factual conditions are met, a safety valve award is mandatory. The sentencing judge has no discretion to deny the award. 18 U.S.C. § 3553(f) ("Notwithstanding any other provision of law . . . the court *shall* impose a sentence pursuant to [the sentencing] guidelines . . . if the court finds [certain facts].") (emphasis added).

Because the safety valve award is mandatory, the factual issues that condition an award must be resolved just as any other necessary factual issue at sentencing must be resolved: that is, by a preponderance of the evidence, as judged by a fact-finder who has seen the evidence. See United States v. Petersen, 276 F.3d 432, 437 (8th Cir. 2002). Such findings are, of course, reviewed for clear error. United States v. Hart, 324 F.3d 575, 579 (8th Cir. 2003).

The fact issue here comes down to one of credibility – the credibility of Alvarado-Rivera's statements in her safety valve proffer, and the credibility of Moya-Vega's statements. Ordinarily, a trial judge's credibility determinations are virtually unreviewable on appeal. But ordinarily the judge has seen the testimony in question. In this case, the judge determined the credibility of statements he neither saw nor heard. The judge did not even have a transcript to read. The judge had nothing more of the statements he was assessing than a letter written by the prosecutor, summarizing the proffers.

A credibility determination based on nothing more than a summary of a statement departs fundamentally from the traditional idea of a credibility judgment.

---

[4]United States v. Alvarado-Rivera, 386 F.3d 861 (8th Cir. 2004).

See, e.g., United States v. Raddatz, 447 U.S. 667, 672-84 (1980) (discussed below). The credibility judgment we review here raises two problems.

*The Reliability and Deference Problem*

This credibility judgment is not entitled to deference. The reasons for deferring to the trial judge's judgments of credibility do not apply here. We have the same cold record the trial judge had. The trial judge did not see the nuances of statement and demeanor that inform a full credibility judgment any more than we have seen them.

Additionally, the trial judge's distance from the safety valve proffers creates the risk of greatly – and unjustifiably – increasing the influence of the prosecutor's assessment of the defendant's credibility.

Finally, where the trial judge's credibility judgment is based simply on a feeling that the defendant's proffer – as relayed in a mere summary – is too improbable to be true, the trial judge's judgment is of questionable reliability. Judges live greatly removed from the worlds of most of the defendants who pass through their courtrooms. What is a mere banality in a defendant's world may seem bizarre and unworthy of belief to a judge. The trial judge here, for instance, (and at least one member of this court) found it strange that Alvarado-Rivera told the prosecutor that she had only used the weight scale in her apartment to weigh a bracelet. There is no reason why the trial judge should have been familiar with the practice of weighing jewelry to assess the value of the metal before selling it to a pawnbroker or at a flea market. And that is why the seeming improbability to the judge, isolated from all other indicia of credibility, is a weak and unreliable basis for judgment.

Even when an assertion is improbable in the defendant's world as well as the judge's, we know that truth *is* sometimes stranger than fiction. A credibility judgment based solely on the seeming probability of a statement – without the other

these elements are particularly surprising or improbable or inconsistent with Alvarado-Rivera's description of her minimal role in her husband's drug business: (1) She said she knew about some of the drugs at her apartment but did not know about the drugs in the trailer, so she led the police to the trailer. That is not improbable. (2) She said she used the scale to weigh a bracelet. That is not improbable. (3) She said the informant was the only drug customer she knew of, but the informant was certain Alvarado-Rivera would drive the car to the sale. That might be surprising if we knew something about how the drug sale to the informant came about. But we don't. Nor did the trial judge. (4) Alvarado-Rivera said her husband sold the drugs, but that she sold food. That is not improbable. Nor does the fact that her sons moved the drugs out of the apartment make any of these assertions more improbable. Nor do the assertions become improbable when taken together rather than one by one.[6]

In short, the trial judge's assessment of Alvarado-Rivera's statement – which he knew only from the prosecutor's letter summarizing the statement – is not only unreliable in principle, but unreasonable on its face. The judge's assessment appears to have been unduly influenced by the judge's hunch, unsupported by evidence, that Alvarado-Rivera was scared and was protecting someone.

---

Yes.
But then it's my responsibility.

Sent. Tr. at 37-38.

[6]Apart from being probable, Alvarado-Rivera's statement is entirely consistent with the evidence – which was that she played a minor role in the crime. Indeed, the final presentence report, which incorporated the government's objections to a preliminary report, assigned a base offense level of thirty, rather than thirty-six, because of Alvarado-Rivera's minor role. Additionally, the report recommended a two-level reduction for Alvarado-Rivera's minor role, and a three-level reduction for acceptance of responsibility.

these elements are particularly surprising or improbable or inconsistent with Alvarado-Rivera's description of her minimal role in her husband's drug business: (1) She said she knew about some of the drugs at her apartment but did not know about the drugs in the trailer, so she led the police to the trailer. That is not improbable. (2) She said she used the scale to weigh a bracelet. That is not improbable. (3) She said the informant was the only drug customer she knew of, but the informant was certain Alvarado-Rivera would drive the car to the sale. That might be surprising if we knew something about how the drug sale to the informant came about. But we don't. Nor did the trial judge. (4) Alvarado-Rivera said her husband sold the drugs, but that she sold food. That is not improbable. Nor does the fact that her sons moved the drugs out of the apartment make any of these assertions more improbable. Nor do the assertions become improbable when taken together rather than one by one.[6]

In short, the trial judge's assessment of Alvarado-Rivera's statement – which he knew only from the prosecutor's letter summarizing the statement – is not only unreliable in principle, but unreasonable on its face. The judge's assessment appears to have been unduly influenced by the judge's hunch, unsupported by evidence, that Alvarado-Rivera was scared and was protecting someone.

---

Yes.
But then it's my responsibility.

Sent. Tr. at 37-38.

[6]Apart from being probable, Alvarado-Rivera's statement is entirely consistent with the evidence – which was that she played a minor role in the crime. Indeed, the final presentence report, which incorporated the government's objections to a preliminary report, assigned a base offense level of thirty, rather than thirty-six, because of Alvarado-Rivera's minor role. Additionally, the report recommended a two-level reduction for Alvarado-Rivera's minor role, and a three-level reduction for acceptance of responsibility.

As a general matter, a credibility judgment based on nothing more than someone else's summary of a statement one neither saw nor heard nor even has a transcript of, is gravely impaired. The trial judge's assessment of Alvarado-Rivera's statement illustrates the principle. The unreliability of an impaired credibility judgment is at the heart, of course, of the due process problem with such judgments.

*The Due Process Problem*[7]

The second problem raised by the kind of impaired credibility judgment we have here is an unconstitutional deprivation of due process. Because the safety valve is a statutory entitlement for those who meet the conditions – not a discretionary award – the safety valve constitutes a liberty interest that cannot be deprived without due process of law. See U.S. Const., Amend. 5. See also, e.g., INS v. St. Cyr, 533 U.S. 289, 345-46 (2001) ("We have recognized the existence of a due process liberty interest when a State's statutory parole procedures prescribe that a prisoner 'shall' be paroled if certain conditions are satisfied.") (citing Pardons v. Allen, 482 U.S. 369, 370-371, 381 (1987) and Greenholtz v. Inmates of Neb. Penal & Correctional Complex, 442 U.S. 1, 12 (1979)).

The process by which a tribunal finds facts that result in a loss of liberty must pass constitutional muster. This is true, of course, for credibility determinations as it is for any other factual finding. We would not hesitate to vacate a judgment in a civil suit tried by a judge, if the decision rested on the kind of impaired credibility judgment we have in this case. If, during the critical testimony, the judge left the courtroom and later made an adverse credibility judgment based merely on a summary of the testimony, we would vacate the judgment without hesitation. That

[7]While defendants preserved the denial of the safety valve for review, neither defendant has made a Due Process argument. The Due Process issue appears on the face of the record, however, and we are not precluded from addressing it.

hypothetical credibility judgment is, in critical respects, like the judgment we examine here.

What process is due when a sentencing judge makes a safety valve credibility finding? The Supreme Court has given us strong guidance. In Raddatz, 447 U.S. 667, the Court considered the due process requirements for a credibility judgment concerning a pretrial motion to suppress certain evidence in a criminal trial.

In Raddatz, the Court reviewed a district judge's adoption, after reviewing the transcript but without hearing the testimony for himself, of a magistrate judge's express credibility findings. It was a difficult question for the Court whether the district judge violated due process requirements by adopting the credibility findings without hearing the testimony himself.

On the view of *any* of the eight Justices who addressed the due process issue in Raddatz, the impaired credibility judgments we review here would seem to violate the Due Process Clause.[8] Raddatz concerned a crucial pre-trial credibility issue. We address a crucial post-trial credibility issue. In both cases, the entire matter turned on the credibility judgment. Here, however, two fundamental elements are lacking – elements crucial to the Court's decision in Raddatz that the process due had been observed: (1) the presence of an original credibility finding made by a judge who had seen and heard the testimony, and (2) the district court's review of the transcript of the hearing conducted by the magistrate judge.

For all of the Justices addressing the due process issue, those two elements of the case were crucial to the issue. Id. at 680-81. For the majority in Raddatz, even those safeguards would likely not constitute due process for the second, reviewing

---

[8]Justice Stewart, the ninth vote, did not address the due process issue. He would have decided the case differently on statutory grounds. See Raddatz at 688-89.

judge to *reject* the first judge's credibility findings and to make his own independent credibility findings without seeing and hearing the statements himself. See id. at 684 (Blackmun, J., concurring and providing the fifth vote); id. at 679, 681 n.7 (Burger, C.J., writing for a five-justice majority as limited by Justice Blackmun's concurrence).

The due process analysis of Raddatz does not countenance a credibility finding *in the first instance* by a judge who neither saw nor heard the statements being assessed, nor had a transcript of those statements, but had merely the prosecutor's written summary of the statements.

Given the extreme importance of credibility judgments for safety valve applicants – in Alvarado-Rivera's case, 60% of her potential sentence hung in the balance — the sort of impaired credibility judgment we have here is woefully inadequate. We think it plain under the Raddatz analysis that the district court erred by denying the appellants the process that was due in order to protect the liberty interest created by the mandatory safety valve.[9]

*Conclusion*

The majority opinion countenances a dramatic departure from the traditional idea of credibility judgments and from basic requirements of due process in determining facts. Thus I dissent.

---

[9]The sentencing judge specifically stated that he wished he could sentence Alvarado-Rivera under the guidelines, rather than under the mandatory minimum sentence.